UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TARIUS WASHINGTON, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> JOSHUA ANDREWS, ) <br> ) <br> Defendant. ) | No. 3:22 C 50045 <br><br> Judge Rebecca R. Pallmeyer |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Tarius Washington, a prisoner in the custody of the Illinois Department of Corrections ("IDOC"), alleges he was subjected to a retaliatory strip search by correctional officer Joshua Andrews in May 2021 while Washington was incarcerated at IDOC's Dixon Correctional Center ("Dixon"). The encounter began after Andrews approached Washington and three other inmates and performed a "pat-down" search of Washington. Washington asserts that he complied with the pat-down but when it concluded, Washington asked Andrews why he had been singled out. According to Washington, the question upset Andrews, who accused Washington of having "an attitude," and then announced that he would show Washington what a "real shakedown" was like before escorting Washington to a shower room, where he proceeded to strip search Washington within plain view of other inmates.

In this action under 42 U.S.C. § 1983, Washington claims that Andrews's conduct violated his First and Eighth Amendment rights. Andrews has moved for summary judgment on both of Washington's claims [69], but because there are genuine disputes of material fact, the motion is denied.

**BACKGROUND**

At summary judgment, the court sets forth the facts in the light most favorable to Washington and gives him "the benefit of all reasonable inferences in his favor." *McDaniel v. Syed*, 115 F.4th 805, 816 (7th Cir. 2024).

Tarius Washington is an inmate in the custody of IDOC; Washington is currently incarcerated at Taylorville Correctional Center, but at the time of the events described here, he was incarcerated at Dixon. (Pl. Resp. to Def. Local Rule 56.1 Statement of Undisputed Material Facts [79] (hereinafter "Pl. Resp. to DSOF") ¶ 1.) The encounter underlying this lawsuit took place on May 13, 2021, and began when Washington was standing outside of his cell at Dixon "for dayroom." (Pl. Local Rule 56.1 Statement of Additional Material Facts [80] (hereinafter "PSOF") ¶ 1.) The court understands Washington to mean that he had been released from his cell at his scheduled time to go to the dayroom, a common area in a prison where inmates may spend recreational time. (*See* Washington Dep. [70-1] at 36:21–37:9 (explaining that correctional officers had opened his cell door from a "control room" because it was "day room time")); *see also Jones v. Williams,* No. 18 C 03686, 2021 WL 3408508, at *1 (N.D. Ill. Aug. 4, 2021) and *Ellis v. Santerelli*, No. 20 C 5959, 2023 WL 4976180, at *5 (N.D. Ill. Aug. 3, 2023) (describing dayrooms in IDOC facilities as common areas).

At around the same time that Washington exited his cell (the timing is not clear from the record), Defendant Andrews and another correctional officer, Kassandra Marinelli, entered the prison unit where Washington was housed. (Pl. Resp. to DSOF ¶ 7.) Andrews describes their general purpose for entering the unit as being to conduct "routine inspections"—presumably a reference to an IDOC policy that "requires correctional staff to search inmates routinely and randomly to deter the presence of contraband and maintain the safety and security of the facility." (Def. Local Rule 56.1 Statement of Undisputed Material Facts [70] (hereinafter "DSOF") ¶¶ 7, 33.) Andrews also asserts that at the time of this incident, Dixon had a "pervasive problem of inmates picking the locks of their cells," and that he and Marinelli were specifically "monitoring for unauthorized movement of inmates who may have picked the locks of their cells."[1] (*Id.* at ¶¶ 9–10.)

---

[1] Washington disputes that Andrews entered the housing unit to conduct a routine inspection, that the prison had a pervasive problem of inmates picking the locks of their cells, and

2

At the time of this incident, Dixon had COVID-19 protocols in place that "requir[ed] social distancing and limit[ed] the number of inmates that could be out of their cells at any one time." (Pl. Resp. to DSOF ¶ 8.) When Andrews entered the housing unit, Washington was standing outside his cell with three other inmates: Robert Walker, Jermaine Foots, and Jamal Warren. (PSOF ¶ 4; Pl. Resp. to DSOF ¶ 11; Washington Dep. at 29:4–30:24; Foots Aff. [80-1] at 1–2.) Andrews approached the four inmates because, he avers, they were fraternizing in close proximity to each other, in violation of social distancing requirements. (DSOF ¶ 11.)

Washington insists that the four inmates "were maintaining an appropriate social distance" (PSOF ¶ 5), but as Andrews points out, the segment of Washington's deposition testimony that he cites for this proposition does not support the statement. (Def. Resp. to Pl. Local Rule 56.1 Statement of Additional Facts [81] (hereinafter "Def. Resp. to PSOF") ¶ 5.) In the cited testimony, Washington simply confirms his recollection that Dixon had "COVID restrictions in place at the time," that Washington "had to be six feet away from another inmate" when he was in the day room, and that "there were limits on the number of inmates that could be released" from their cells in the housing unit "at any one time." (Washington Dep. at 37:12–24.) That testimony establishes that Washington understood the rules—but not that he was in compliance with them. In fact, Washington testified that he did not know exactly how wide the hallway outside his cell was but agreed that the distance was not more than 12 feet. (*Id.* at 38:10–39:3.) Washington further testified that he did not know (or did not remember) how far away Foots, Walker, and Warren were standing from each other, or how far apart he himself was from any of the three, except that

---

that Andrews was on the lookout for inmates who may have picked the locks of their cells. (Pl. Resp. to DSOF ¶¶ 7, 9–10.) But Washington offers no evidence of his own to rebut these propositions; instead, he states only that he is "unaware of evidence" to support the assertions other than Andrews's and Marinelli's deposition testimony. (*Id.*) Andrews's and Marinelli's deposition testimony, however "self-serving," is sufficient to support summary judgment, *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013), and mere speculation as to its veracity cannot create a genuine issue of material fact. *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

he remembers that they were far enough away that he could not touch them with his hands. (*Id.* at 39:4–22, 40:4–6.) At one point, Washington recalls, he was close enough to the other three men that they were concerned that he would (or had already) accidentally spit on them as he rapped lyrics; after they voiced this concern, he "stepped back a little bit farther." (*See id.* at 40:7–24.) In short, the men's proximity to one another, and whether there was a basis for concern about this, cannot be determined at summary judgment.

Once Andrews had approached the four inmates, he proceeded to conduct a pat-down search of Washington, but not the others. (PSOF ¶ 6.) Why Andrews chose to search Washington is disputed. Andrews testified that, to his knowledge, he had not had any interactions with Washington prior to that day. (Andrews Dep. [70-3] at 24:2–4.) According to Andrews, he chose to search Washington because he suspected Washington was not authorized to be out of his cell at that time, a suspicion based on Andrews's observation that more inmates were out of their cells in the unit than permitted under the Covid protocols, and on Washington's acknowledgement that he did not reside in the cell near where he was standing.[2] (DSOF ¶¶ 12–14; Andrews Dep. at 14:3–24.) Andrews admits, however, that he was uncertain whether the other inmates were in their proper place (Andrews Dep. at 13:24–14:2), and even on his account, it is unclear why he did not decide to search Foots, Walker, or Warren.

Washington maintains that he *was* in front of his own cell and suspects he may have been singled out because of previous, negative interactions with a "tactical team" of correctional officers that included Andrews. (Pl. Resp. to DSOF ¶¶ 12–14; Washington Decl. [79-1] ¶ 5.) It appears Washington was referring to an earlier incident in which he was disciplined for "illegal possession of 45 muscle relaxers that he stole from the property of an inmate that had died from the Covid-

---

[2] Andrews asserts that, after the incidents at issue here, he "conferred with the correctional staff assigned to" Washington's housing unit and learned from them that Washington was "out of his cell without authorization at the time of the initial pat-down search." (DSOF ¶ 22.) The statements of these other, unnamed correctional staffers are inadmissible hearsay and will not be considered by the court. *Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023).

19 virus." (Pl. Resp. to DSOF ¶ 30; *see* Washington Dep. at 87:8–21 (explaining that Andrews was a part of the "tactical team," some members of which caught Washington with the muscle relaxers).) Washington did not say that Andrews was present during this episode but did opine that officers on the team would have "talk[ed] about it amongst each other," and said of Andrews (somewhat elliptically) that "he'd know me, but you don't really know me. You know?" (*Id.* at 87:16–17.) Further, according to Washington, the muscle-relaxers incident was "well-known" within Dixon in general. (*Id.* at 120:3–5.) In that vein, Washington testified that when Andrews approached him specifically on May 13, 2021, he said to Washington "How about you? You're always up to something," and "I know — I know who you are."[3] (*Id.* at 86:20–87:5.) Interestingly, it does not appear that Andrews was asked about the muscle-relaxers incident during his own deposition, and the evidence presented by Andrews is otherwise silent on whether he knew about or remembered that incident, and whether it motivated his decision to single out Washington.[4]

Whatever the reason for the pat-down may have been, Washington claims that he complied fully with the search once Andrews initiated it. (PSOF ¶ 6.) During this search, Andrews removed several items from Washington's pockets, including "a folded playing card." (*Id.* ¶ 7.) What other items were recovered is not clear, but Washington says they included a "door key, ID," and "some tissue paper." (*Id.* ¶ 16.) The court is uncertain why Washington would have had access to a door key. With respect to the folded playing card, Washington admits that inmates at Dixon would sometimes use playing cards for the purpose of defeating the locking mechanism of

---

[3] Suspicion that Washington had access to drugs may have provided a valid penological reason for a more invasive search, and Washington now appears to recognize that he may have been targeted for the pat-down because Andrews knew about the muscle relaxers incident. When asked directly about this at his deposition, however, Washington backtracked and testified that even if Andrews had heard about the incident, he would not have known Washington by face. (*Id.* at 122:20–123:3.)

[4] Washington had apparently also previously been disciplined on three occasions for "unauthorized movement" outside his cell. (*See* Pl. Resp. to DSOF ¶ 23; Washington Dep. at 54:3–55:19.) The record is silent, however, on whether Andrews was aware of *these* prior violations.

their cells (Pl. Resp. to DSOF ¶ 34), but insists that he had not been using the card for that purpose. (PSOF ¶ 9.) Instead, as Washington tried to explain to Andrews at the time, Washington had been using the card as a bookmark. (*Id.* ¶ 7.)

After the pat-down concluded, Washington asked Andrews why he had been singled out for the search. (*Id.* ¶ 10; *see also* Washington Dep. at 89:3–6 (testifying that he asked "Hey, man, why did you single me out, out of everybody to—to shake me down? I wasn't doing anything—like, really wasn't doing anything wrong.")) In response, Washington recounts, Andrews accused Washington of displaying "an attitude," became upset, and then said, "I'm going to show you what a real pat search looks like—a real shakedown is." (PSOF ¶ 11.) Andrews denies that Washington made any comments to him during the search or even asked Andrews why he had been singled out. (Def. Resp. to PSOF ¶ 12; Andrews Dep. at 23:23–24:1.) Rather, Andrews asserts that he decided to conduct a strip search of Washington because Washington "would not stand still" to allow a proper pat-down search, which Andrews viewed "as an indicator of possibly something being hid." (Andrews Dep. at 17:19–18:4.)

Andrews then escorted Washington to a shower room and ordered him to strip naked. (Pl. Resp. to DSOF ¶ 17; PSOF ¶ 12.) Washington does not describe the positioning of the shower room relative to the hallway but maintains that other inmates who were walking around the vicinity of the shower room would have been able to see him. (PSOF ¶ 12.) Washington says he told Andrews that he did not like to be naked in view of other inmates, but this only resulted in Andrews becoming more upset and again ordering Washington to remove his clothing. (*Id.* ¶¶ 12–13.) Washington did so, and because several inmates walked by and saw his unclothed body, he felt humiliated. (*Id.* ¶¶ 14–15.)

When Washington removed his pants, several of the items in his pants pockets fell out, including his door key, ID card, and "likely" the tissue paper. (*Id.* ¶ 16.) As Andrews searched the pants, Washington bent over to pick up his key and ID card. (*Id.* ¶ 17.) Andrews accused Washington of having thrown drugs down the drain of the shower room; Washington responded

6

that he did not have any drugs and had not thrown anything down the drain. (*Id.* ¶ 18.) Some 20 minutes after the strip search ended, Officers Andrews and Marinelli inserted a camera (variously referred to as a "scope camera" or "snake cam") into the drain to find what Andrews believed Washington had disposed of. (Pl. Resp. to DSOF ¶ 26; Andrews Dep. at 67:13–68:2.) Through the camera, Marinelli saw a clear plastic bag with some kind of white powder in it (PSOF ¶ 24), but nothing was pulled out of the drain. (*Id.* ¶ 23; Andrews Dep. at 68:2–4 (explaining that he "could see the item down there," but does not "know what it was," and was "unable to come up with a method to retrieve the item."))

Andrews charged Washington with four rules infractions: possessing "dangerous contraband," possessing "drugs and drug paraphernalia," "disobeying a direct order essential to safety," and "unauthorized movement." (PSOF ¶ 25.) At a hearing five days later before an "Adjustment Committee" consisting of Dixon employees Michael Remmers, Scott Silva, and Justin Wilks, Washington was found guilty of each infraction. (*Id.* ¶ 26; IDOC Adjustment Comm. Final Summary Rep. [70-7] at 1, 2.) Washington states that he was disciplined with "two months in C-grade detention, 28 days of segregation, and a six-month restriction on contact visits." (PSOF ¶ 28.) In approving this discipline, the Adjustment Committee considered the fact of Washington's previous discipline for the muscle-relaxers incident. (Pl. Resp. to DSOF ¶ 30.)

Washington filed a grievance regarding the May 13, 2021 strip search incident and his resulting punishment. (*Id.* ¶ 29.) Initially, this grievance was denied (*see id.*; Admin. Rev. Bd. Resp. [70-6] at 3), and Washington served out his 28 days in "segregation," two months in "C-grade detention," and most of the "contact visit restriction." (PSOF ¶ 29.) On a review in October 2021, an Administrative Review Board at Dixon sustained Washington's grievance in part: The infractions for possession of dangerous contraband and possession of drugs and drug paraphernalia were "deleted," at least in part because the charges were "unsubstantiated," and the infraction for "disobeying a direct order essential to safety and security" was downgraded to an infraction for simply "disobeying a direct order." (*Id.*; Admin Rev. Bd. Resp. at 2.)

Washington initiated this lawsuit on February 15, 2022, naming as Defendants Officer Andrews, the Dixon employees who had initially found Washington guilty of the infractions (Remmers, Silva, and Wilks), and the Dixon grievance officer who had initially denied Washington's grievance (an Officer B. Wells). ([1].) An amended complaint filed on May 16, 2022 names only Andrews as a Defendant. ([12].) Washington alleges that Andrews violated both his First and Eighth Amendment rights by subjecting him to the strip search in the shower room. Defendant Andrews has moved for summary judgment, arguing that his conduct did not violate the Constitution and that, even if it did, he is entitled to qualified immunity. (Mem. [71] at 7, 11, 13.)

## DISCUSSION

The standards that govern a summary judgment motion are familiar: Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law." *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022) (quoting FED. R. CIV. P. 56(a)). When considering a motion for summary judgment, courts must "view the record in the light most favorable to the nonmoving party." *Id*.

### I. First Amendment Claim

To prevail on his First Amendment retaliation claim, Washington must show that: "(1) he engaged in protected activity; (2) he suffered a deprivation likely to deter future protected activity; and (3) his protected activity was a motivating factor" in Andrews's "decision to retaliate." *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015)). A motivating factor "does not amount to a but-for factor or to the only factor." *George v. Walker*, 535 F.3d 535, 538 (7th Cir. 2008) (internal citations omitted). "Once a plaintiff demonstrates that an improper purpose was a motivating factor" behind the punishment or deprivation, "the burden shifts to the defendant to show that the same decision would have been made in the absence of the protected speech." *Id.* (internal citations omitted).

8

As noted, Andrews contends he is entitled to qualified immunity on the First Amendment claim. Although this is an affirmative defense, once a defendant has raised it, the plaintiff has the burden of defeating it. *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). To do so, Washington must demonstrate not only (1) that the facts, when viewed in the light most favorable to him, establish a violation of his constitutional rights, but also (2) that Andrews's conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known" at the time. *Gaddis v. DeMattei*, 30 F.4th 625, 632 (7th Cir. 2022). This second prong of the test requires Washington to "point to cases establishing a rule" that would make Andrews's liability "obvious" at the time of the alleged violation; the cases need not be "directly on point," but Washington may not rest on "generalities." *Id.*

Andrews contends that at the time of the events at issue, it was not clearly established law that a strip search was the sort of retaliatory conduct that could trigger First Amendment liability. (*See* Mem. at 13 (claiming that "strip searches are routinely upheld as legal" and that Andrews is unaware "of any caselaw holding that mere incidental observation of an inmate's unclothed body by other inmates during a strip search rises to the level of a constitutional violation"); Reply [82] at 6–7 (arguing that cases cited by Washington are not sufficiently analogous to defeat qualified immunity because the alleged retaliatory conduct in those cases was of a different nature, including "issuing a disciplinary ticket" and "forcing an inmate to work in dangerous conditions.")) 

To the extent Andrews is arguing that there can be valid penological reasons for a strip search, he is correct. But he overstates the case; the motivation for Andrews's conduct is relevant, as the Seventh Circuit *has* held that a "retaliatory strip search" may give rise to First Amendment liability. *See Mays v. Springborn*, 719 F.3d 631, 634–35 (7th Cir. 2013) (*Mays II*); (*see also* Opp. at 9 (citing *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009) (*Mays I*)).) Washington nonetheless bears the burden of showing that existing law made it obvious that his asking Andrews why he had been subjected to the pat-down search was protected First

9

Amendment activity. To make that determination, the court asks whether the prisoner "engaged in this speech in a manner consistent with legitimate penological interests." *Whitfield v. Spiller*, 76 F.4th 698, 708 (7th Cir. 2023) (quoting *Watkins v. Kasper*, 599 F.3d 791, 796 (7th Cir. 2010)). Inmate speech is thus unprotected where it is "disruptive" and "confrontational," or otherwise "undermine[s] the authority of prison officials and their ability to implement policy and maintain discipline." *Whitfield*, 76 F.4th at 708–09 (internal citations omitted).

"The filing of a prison grievance" will almost always be "constitutionally protected activity." *Daugherty*, 906 F.3d at 610. *But see Watkins*, 599 F.3d at 798 (quoting *Brodheim v. Cry*, 584 F.3d 1262, 1273 (9th Cir.2009)) (suggesting that even a grievance might be unprotected if presented in a way that poses "a substantial threat to security and discipline.") But as the Seventh Circuit held in *Pearson v. Welborn*, "legitimate complaints" from prisoners do not "lose their protected status simply because they are spoken," rather than being filed in writing. 471 F.3d 732, 741 (7th Cir. 2006). The question remains whether the complaint was made "in a *manner* consistent with [the plaintiff's] status as a prisoner." *Watkins*, 599 F.3d at 798 (quoting *Freeman v. Tex. Dep't of Crim. Just.*, 369 F.3d 854, 864 (5th Cir. 2004)); *see Kervin v. Barnes*, 787 F.3d 833, 835 (7th Cir. 2015) (plaintiff engaged in unprotected "backtalk" when he defied a prison guard's order "by asking to be let out of the day room to meet with his lawyer after being told that he could not leave the room just yet"); *Watkins*, 599 F.3d at 798 (inmate's verbal complaint about a prison librarian disposing of or misplacing his personal legal materials was unprotected where inmate confronted the librarian "face-to-face in the library, presumably within earshot of other prisoners, using a loud voice and active hand gestures.")

As described earlier, Washington asserts that he fully complied with the pat-down search, did not ask Andrews why he had been subjected to the search until after it was completed, and did not ask the question in an aggressive or confrontational way. A jury might conclude that Washington's question, made in front of at least three other inmates directly after the search, amounted to "backtalk" challenging Andrews's authority. But the record could also support a

conclusion that Washington communicated his complaint in "a courteous, oral conversation" falling under the First Amendment's protection. *Watkins*, 599 F.3d at 798. Andrews is not entitled to qualified immunity on this basis.

In Washington's account, after he questioned why he had been singled out from his three companions for the search, Andrews accused him of having an attitude and stated he was going to show Washington "what a real pat search looks like" or what "a real shakedown is." These facts, if accepted, would support a finding that Washington's verbal complaint was a motivating factor in Andrews's decision to conduct the subsequent strip search.[5]

Andrews argues that Washington's First Amendment claim nevertheless fails on the merits because the strip search was "occasioned by legitimate penological concerns" and "would have occurred regardless of Plaintiff's alleged verbal complaints about being 'singled out.'"[6] (Mem. at 8–9.) In § 1983 cases, however, "causation is typically a question best left for the jury." *Hunter v. Mueske*, 73 F.4th 561, 568 (7th Cir. 2023) (citing *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010)). So too here, as the facts are disputed: Andrews contends, first, that Washington was subjected to an unclothed body search because he "was moving around evasively" during the pat-down "and refusing to comply with Lieutenant Andrews's direct order to submit to this less

---

[5] In his Reply, Andrews emphasizes Washington still does not know for certain why Andrews chose him to pat down, claiming that this "destroys any claim based on alleged retaliation." (Reply at 6.) Andrews confuses the issue: Washington alleges that the *strip search* was retaliatory, not the initial pat-down.

[6] Andrews appears to contend that he cannot be liable because the initial search was appropriate. (*See, e.g.,* Mem. at 9 (arguing that Andrews "did not require any specific cause or suspicion to single out Plaintiff among the four individuals for a search" because IDOC policy "requires correctional staff to search inmates routinely and randomly to deter the presence of contraband and maintain the safety and security of the facility"); Reply at 1, 3 (highlighting Andrews's contentions that Washington was "out of his cell when he should not have been" and "was violating social distancing requirements.")) Washington counters (correctly, in the court's view) that "[w]hether accurate or not, this set of assertions addresses only the Defendant's ostensible reason for engaging in a pat-down search" and is "not relevant to the question of whether the Defendant engaged in the subsequent *unclothed-body* search of the Plaintiff for retaliatory reasons." (Opp. at 8.)

invasive search." (Mem. at 10.) Andrews appears to argue that there is no genuine dispute on this issue because all that Washington has offered is his own "uncorroborated deposition testimony," which Andrews deems "conclusory." (Reply at 5.) Deposition testimony based on personal knowledge is admissible evidence at summary judgment, however. *Hill v. Tangherlini*, 724 F.3d 965, 967–968 (7th Cir. 2013); *see also supra* at p. 3 n. 1. And Washington's testimony on this topic—that he was not "being evasive or fighting the search in any way" (Washington Dep. at 52:19–22, 56:2–3)—states a fact, rather than a conclusion.

Andrews also argues that Washington's three previous infractions for "unauthorized movement," combined with his previous infraction for illegal possession of muscle relaxers, show that Andrews's strip search of Washington was "rooted in legitimate penological concerns for safety and security." (Reply at 4; *see also* Mem. at 9–10.) That some valid justification for allegedly retaliatory conduct can be articulated during litigation does not conclusively establish that the conduct would have occurred in the absence of retaliatory animus. Moreover, while a jury could conclude from Washington's testimony that Andrews was aware of the muscle relaxers incident at the time, Andrews himself has not testified that Washington's prior disciplinary history (either for possession of the muscle relaxers or unauthorized movement) motivated him to conduct the strip search.[7] Washington's First Amendment claim survives summary judgment.

## II. Eighth Amendment Claim

"Strip-searching a prisoner violates the Eighth Amendment only if it is 'maliciously motivated, unrelated to institutional security, and hence totally without penological justification.'"

---

[7] Confusingly, Andrews also appears to contend that Washington having received other disciplinary infractions for unauthorized movement and possession of drugs *after* the events underlying this case supports his decision to conduct the strip search at issue. (*See* Reply at 4.) These later infractions cannot be evidence "to show [Andrews's] motivation in subjecting [Washington] to the unclothed body search" at the time because they had not yet occurred. (*Id.*) Similarly, Andrews seems to suggest that the fact of his discovering suspected drugs during the course of the strip search should serve as "the ultimate justification for the unclothed body search." (Mem. at 10.) Leaving aside that this fact is contested, what Andrews discovered during or after the strip search does not bear on his state of mind *before* conducting the strip search.

12

*Jones v. Anderson*, 116 F.4th 669, 678 (7th Cir. 2024) (quoting *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004)). To overcome summary judgment on this claim, Washington must "produce evidence showing that" Andrews conducted the search itself "in a harassing manner intended to humiliate and inflict psychological pain." *Id.* The fact of a strip search being conducted "in view of other inmates" can be "relevant evidence" for a jury to consider in determining whether the search was done "with an intent to harass." *Mays I*, 575 F.3d at 649–650.

The evidence here, taken in the light most favorable to Washington, could support a jury finding that Andrews conducted the strip search without penological justification and with an intent to harass or humiliate Washington. Again, Washington's version of the story is that Andrews initiated the strip search not for legitimate reasons but instead to retaliate against Washington for having complained about the initial search. In response, according to Washington, Andrews proceeded with the strip search despite Washington's fear (later realized) that other inmates would be able to view his naked body.

Andrews insists there "is no evidence in the record to support [Washington's] allegations that he was being observed by other inmates or otherwise humiliated" during the strip search.[8] (Mem. at 12.) Not so: Andrews has stated as much in a signed affidavit and reiterated that testimony during his deposition. (*See* Washington Aff. [79-2] at 1–2; Washington Dep. at 99:8–13.) Andrews's qualified immunity defense to the Eighth Amendment claim also fails: the law was clear at the time of these events that a malicious strip search, unjustified by penological

---

[8] Andrews also posits that "even if . . . other inmates were present, Plaintiff's expectation of privacy in a maximum-security prison facility is extremely limited given the institution's interest in maintaining order and security." (Mem. at 12 (citing *Meriwether v. Faulkner*, 821 F.3d 408, 418 (7th Cir. 1987)).) Washington is not bringing suit for an alleged violation of his Fourth Amendment right to privacy. Even so, while Andrews is correct that the Fourth Amendment protects an inmate's right to bodily privacy during visual inspections only "in a severely limited way," the Seventh Circuit has held that "strip or body cavity search[es]" of prisoners fall within the Fourth Amendment's ambit and must be assessed for their reasonableness, considering "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Henry v. Hulett*, 969 F.3d 769, 779 (7th Cir. 2020).

interests and conducted in view of other inmates, can violate the Eighth Amendment. Summary judgment is denied on this claim as well.

### III. Limitation on Potential Award

For the reasons stated here, the court denies Andrews' motion for summary judgment, but the parties are encouraged to discuss settlement. They are reminded that, as Andrews observes, even if the court finds him liable, under the Prison Litigation Reform Act Washington is not entitled to compensatory damages because he did not suffer a physical injury. (Mem. at 14 (citing 42 U.S.C. § 1997e(e)); Opp. at 15.) If he prevails at trial, Washington will be entitled only to nominal and punitive damages. See Siebert v. Severino, 256 F.3d 648, 655 (7th Cir. 2001) (quoting Erwin v. Cnty. of Manitowoc, 872 F.2d 1292, 1299 (7th Cir.1989)) ("punitive damages are recoverable under Section 1983 even in the absence of actual damages where the jury concludes that the defendant's conduct was 'motivated by evil intent or involv[ed] reckless or callous indifference to the federally-protected rights of others.'")

### **CONCLUSION**

Andrews's motion for summary judgment [69] is denied as to both of Washington's claims. The court will schedule a status conference for the purpose of setting a trial date.

ENTER:

Dated: March 21, 2025

_____
REBECCA R. PALLMEYER
United States District Judge